UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

NETJETS AVIATION, INC.,

                **Plaintiff,**                        **Case No. C2-05-CV-687**
                                                **JUDGE GREGORY L.  FROST**
**v.**                                        **Magistrate Judge Abel**

INTERNATIONAL BROTHERHOOD
      OF TEAMSTERS & INTERNATIONAL
      BROTHERHOOD OF TEAMSTERS LOCAL
      1108,

                **Defendants.**

## OPINION & ORDER

This case requires the Court to review an arbitrator's award that was issued pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*  (Doc. # 1).  The Court considers this matter pursuant to cross motions for summary judgment filed by Plaintiff NetJets Aviation, Inc. ("NetJets") and Defendants International Brotherhood of Teamsters ("International") and International Brotherhood of Teamsters Local 1108 ("Local 1108") (collectively "Union"). (Doc. # # 22, 23).  The parties have completed briefing the motions, and the Court therefore issues the following decision.

## BACKGROUND

NetJets is a Delaware corporation that sells fractional ownership in aircraft.  (Doc. # 1 ¶ 2, 7).[1]  International is the exclusive collective bargaining representative for all of NetJets' pilots via a collective bargaining agreement ("Agreement") between the two parties that was created

---

[1] The Court cites to the undisputed portions of the pleadings due to the lack of deposition or affidavit testimony.

pursuant to the RLA.  *Id.*  at ¶ 3; Doc. # 13 at ¶ 1; Doc. # 21 Ex. A.  The Local 1108 is the local representative of NetJets' pilots.  *Id.*  at ¶ 4.

NetJets employed Jason Piper ("Piper") as a First Officer in May 2002.  *Id.* at ¶ 16.  In that capacity, Piper was responsible for assisting or relieving the Captain in the "manipulation of flight controls of an aircraft while in flight."  (Doc. # 21 § 3.3).  Piper also served as Chairman of the Union's Communications Committee.  (Doc. # 1 Ex.  A at 3, 4).  Through that position, Piper became one of a very few number of people who could make changes on the Union's website.  *Id.*  at 4.

In 2004, NetJets and the Union reached a tentative agreement regarding an amendment to the Agreement.  (Doc. # 1 ¶ 11).  In August 2004, with a vote on the amendment looming, NetJets sent each of its pilots a DVD entitled "The Contract is the Foundation for Everyone's Success" encouraging them to vote in favor of the amendment.  *Id*.

Two months later, a pilot that worked for NetJets informed the company that a video had been posted on the message board portion of the Union's website that was accessible to pilots.  *Id.* at ¶ 12.  NetJets conducted an investigation and determined that Piper had created the video.  *Id.*  at ¶ ¶ 16-18; *Id.* at Ex. A at 4, 6.

The content of the DVD, which is thirty seconds in length, is described as follows:

> [The] video tape ... showed 'Contract Stress Relief–10/10/04' on a red background.  It then showed a close-up of the cover of the DVD, moving to the cover placed on a black background.  The face of the DVD has its title, 'The Contract is the Foundation for Everyone's Success' at the top, the date 9-28, DVD and 'Running Time 36 Minutes' in the center and the word 'NETJETS' at the bottom.  The scene then shifts to a picture of a semi-automatic rifle being held with the left arm showing a blue uniform with three stripes.  The scene then shifts to the target DVD with bullets being fired into the DVD, including a close-up showing the holes being made.  The scene next shifts to the grass, apparently below the target with a close-up of the DVD case broken into pieces and then the

2

> DVD itself with bullet holes in it.  Finally, there are the words 'Anyone care to guess how I voted?'  The words of the background music ... end with the words 'We will, we will rock you.'

(Doc. # 1 Ex. A at 3).  After becoming aware of the DVD, the Union removed it from its website and stripped Piper of his title as the Chairman of the Union's Communications Committee. (Doc. # 1 Ex. A at 4).

Subsequently, a NetJets representative viewed the DVD and met with Piper and the Union.  (Doc. # 1 at ¶¶ 25-26; Doc. # 1 Ex.  A at 4).  Shortly thereafter, NetJets terminated Piper's employment.  (Doc. # 1 at ¶ 26).  The Union grieved Piper's termination pursuant to the Agreement.  *Id.* at ¶ 27.  The arbitration took place on April 26, 2005 before Arbitrator Robert Harris ("Harris"), Chairman and Sole Member of the System Board of Adjustment ("Board"). *Id.* at ¶ 28; Doc. # 1 Ex.  A at 2.

Harris issued his Decision and Award ("Award") on June 30, 2005.  (Doc. # 1 Ex.  A). The Award set forth the factual scenario surrounding the grievance, outlined the testimony from the April 26, 2005 hearing, noted that Piper had admitted to creating the video, stated that Piper had apologized for his actions, and discussed the positions of the parties.  *Id.* at 4-10.  Harris framed the issue as whether NetJets' decision to terminate Piper was "appropriate."  *Id.* at 10. Ultimately, Harris concluded that Piper's actions were not a "symbolic murder" of NetJets' officials but were rather "just an attack on the tentative agreement."  *Id.*  Moreover, Harris noted that Piper created the video at his home, not at or near his workplace.  *Id.* at 12.  Harris also stated that there was a clear lack of evidence that anyone, "other than pilots" saw the video.  *Id.* As a result, Harris sustained the grievance in part.  Specifically, Harris concluded:

> Grievant shall be returned to work without back pay, but with full seniority restored if he agrees to sign a letter indicating that he will not, for a one-

3

year period, in any way advise the Union about websites, or otherwise engage in any activity which would allow him to take part in the creation or modification of the Union website.  Grievant will also be responsible for the payment of costs of his retraining.  In the event that he refuses to sign such a letter, his discharge shall be upheld.  The Board shall retain jurisdiction for the sole purpose of resolving any disputes regarding the enforcement of this Award.

(Doc. # 1 Ex. A at 13).

NetJets filed the instant action on July 15, 2005 seeking an Order vacating the Award in addition to its attorney's fees and costs.  (Doc. # 1at ¶ ¶ 30-32).  The Union then filed its Answer and Counterclaim, moving the Court for an Order requiring NetJets to reinstate Piper to his former position in accordance with the Award.  (Doc. # 13).  The Union also requests attorney's fees and costs.

The parties and the Court agree that no genuine issues of material fact exist.  (Doc. # 22 at 1; Doc. # 23-2 at 1).   Accordingly, the parties are entitled to judgment as a matter of law and each side moves for summary judgment.   Those motions are now ripe; thus, the Court now turns to an examination of the motions and the issues presented therein.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court must therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.  *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

4

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).  However, in ruling on a motion for summary judgment, "a district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."  *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

## **DISCUSSION**

NetJets urges the Court to vacate the Award by asserting that the Award violates well-established public policy favoring safety in air travel and workplace safety.  (Doc. # 22 at 9-18; Doc. # 26 at 5-17).  Essentially, NetJets argues that Piper's actions demonstrate that he would be a threat to the safety of NetJets' passengers and employees.  *Id.*  To the contrary, the Union posits that the RLA precludes public policy review of the Award.  (Doc. # 23 at 10-14; Doc. # 27 at 3-5).  The Union continues by contending that even if the RLA allows an award to be overturned on public policy grounds, the Award does not violate public policy.  (Doc. # 23 at 10-14; Doc. # 27 at 5-9).  The Court concludes that public policy does not constitute a basis for

reviewing the Board Awards under the RLA.

## I.     THE RLA'S STATUTORY FRAMEWORK

The RLA was created to "'avoid any interruption to commerce or to the operation of any [railroad] engaged therein'" caused by labor-management disputes.  *International Brotherhood of Teamsters, et al., v. UPS Co.*, No.  05-5478, 2006 U.S. App. LEXIS 10354, at *4-5 (6th Cir. 2006) (citing 45 U.S.C. § 151a(1) and H. R. Rep. No. 328, at 1 (1926) (noting that the Act would ensure "continuity and efficiency of interstate transportation service, and ... protect the public from the injuries and losses consequent upon any impairment or interruption of interstate commerce through failures of managers and employees to settle peaceably their controversies")). In 1936, Congress extended the Act to "every common carrier by air engaged in interstate or foreign commerce."   Act of April 10, 1936, Pub. L. No. 487, 49 Stat. 1189 (codified at 45 U.S.C. § 181).

Section 3 of the RLA grants adjustment boards exclusive jurisdiction to resolve disputes over the "interpretation or application of [collective bargaining] agreements" affecting the railroad and airline industries.  45 U.S.C. § 151 *et seq*.  The Act divides labor disputes into four categories, only one of which is relevant here.  "Minor" disputes:

> grow out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions. Minor disputes involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation[,] . . . . develop from the interpretation and/or application of the contracts between the labor unions and the carriers . . . . [and] pertain[] only to disputes invoking contract-based rights.

*Hawaiian Airlines v. Norris*, 512 U.S. 246, 252-54 (1994) (internal citations and quotations omitted).  Minor disputes are handled in the following manner:

> To address 'minor disputes,' Congress amended the Act in 1934 to

6

> give the National Railroad Adjustment Board power to settle such disputes definitively.... After the 1934 amendments, if either party filed a 'minor' dispute with the Board, the Board had 'exclusive primary jurisdiction' to issue a decision that was binding as to both parties.
>
> In 1936, Congress extended most of the obligations and rights established by the Act to the airline transport industry, requiring the parties to use 'system, group, or regional boards of adjustment,' instead of the National Railroad Adjustment Board, to resolve minor disputes.  Congress gave the system boards the same exclusive jurisdiction over 'minor disputes' in the airline industry that the National Railroad Adjustment Board has over such disputes in the railroad industry.... Save for relying on system boards rather than the National Railroad Adjustment Board as the forum for minor-dispute resolution, the Act makes the resolution process and its applicability to minor disputes identical for the airline and railway industries.

*UPS Co.*, 2006 U.S. App. LEXIS 10354, at *11-14 (internal citations omitted).

In accordance with the 1936 amendments to the RLA, Section 22 of the Agreement established the Board to "adjust and decide disputes which may arise" under the Agreement. (Doc. # 21 Ex. A § 22.1(a) & (b)).

## II.  JUDICIAL REVIEW OF DECISIONS MADE PURSUANT TO THE RLA

This Court may review Board determinations under the RLA only when: (1) the Board failed to comply with the requirements of the RLA; (2) the Board exceeded its jurisdiction; or (3) there was fraud or corruption by the Board. 45 U.S.C. § 153 First (q). The Supreme Court has strictly limited the scope of review to these three items. *See Union Pacific R.R. Co. v. Sheehan*, 439 U.S. 89, 94 (1978).  Thus, the decisions of RLA-created boards are subject to a standard of review that has been characterized as "among the narrowest known to the law."  UPS, 2006 U.S. App.  LEXIS 10354, at *14  (6th Cir.  April 26, 2006) (quoting *Atchison, T. & S. F. R. Co. v. Buell*, 480 U.S. 557, 563 (1987)).

The Sixth Circuit indicated that "this standard of review is narrower even than the highly

deferential 'abuse of discretion' standard." *Jones v. Seaboard System Railroad*, 783 F.2d 639,

642 (6th Cir. 1986). The Supreme Court explained the rationale behind this restrictive standard

as follows:

> The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations. These statutes reflect a decided preference for private settlement of labor disputes without the intervention of government: The Labor Management Relations Act of 1947, ... 29 U. S. C. § 173(d), provides that '[f]inal adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement.' ... Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.

*United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37-38 (U.S. 1987).[2]

As a result, "an arbitrator must find facts and a court may not reject those findings simply

because it disagrees with them." *Id.* In other words, if: (1) the arbitrator is even arguably

---

[2] While *Misco* addressed the review of an arbitration award under the Labor Management Relations Act, this Court has cited *Misco* with approval when considering awards under the RLA. *See Airline Professionals Ass'n, Teamsters Local Union 1224 v. ABX AIR, Inc*., No. 04-cv-663, 2005 U.S. Dist. LEXIS 25345 (S.D. Ohio 2005); *see also Jetstream Int'l Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, No. C-3-91-204, 1993 U.S. Dist. LEXIS 21304 (S.D. Ohio 1993); *see also American Train Dispatchers Ass'n v. CSX Transp., Inc*., No. 1:04-CV-1433, 2005 U.S. Dist. LEXIS 21370 (N.D. Ohio 2005).

construing or applying the contract and acting within the scope of his authority; (2) the award "draw[s] its essence from the contract," and (3) the award does not "reflect the arbitrator's own notions of industrial justice," a court cannot overturn the award even if the court is convinced that the arbitrator committed a "serious error." *Id.* Consequently, in determining whether the Board exceeded its authority, the Court must "broadly construe the [A]greement and resolve all doubts in favor of the Board's authority." *Zeviar v. Local No. 2747, Airline, Aerospace and Allied Employees*, *IBT*, 733 F.2d 556, 559 (8th Cir. 1984).

The Court may not vacate the award simply because it disagrees with the arbitrator's interpretation of the contract. *Id.* This is so because the parties "authorized the arbitrator to give meaning to the language of the agreement." *Id.* Following that logic, courts also lack authority to disagree with an arbitrator's decision regarding remedies for contract violations. *Id.* The Supreme Court commented that to permit the Courts to do otherwise would result in interference with the "speedy resolution of grievances by private mechanisms." *Id*

Thus, the Court's review is limited to whether the Board: (1) failed to comply with the RLA; (2) exceeded its jurisdiction; or (3) engaged in fraud and/or corruption. *Edwards v. United Parcel Service*, 16 Fed. Appx. 333, 336 (6th Cir. 2001) (unreported). Because the Court is convinced none of these grounds are present, NetJets' motion for summary judgment is **DENIED** (Doc. # 22) and the Union's motion for summary judgment (Doc. # 23) is **GRANTED**. *Continental Airlines, Inc. v. International Brotherhood of Teamsters*, 391 F.3d 613, 617 (5th Cir. 2004).

III.    **NETJETS' MOTION FOR SUMMARY JUDGMENT**

As summarized above, NetJets asserts that the Award should be vacated on public policy

grounds. (Doc. # 22 at 1-18; Doc. # 26 at 1-17). The Union, however, contends that NetJets motion for summary judgment should not be granted because NetJets fails to assert a recognized ground for vacating the Award. (Doc. # 23 at 4, 10-14; Doc. # 27 at 3-5). The Union's arguments prevail.

The parties agree that the RLA applies and that this is a minor dispute. As such, the Court's review of the Award is limited to discerning whether the Board complied with the RLA, exceeded its jurisdiction, or engaged in fraud and/or corruption. The Supreme Court held that "Only upon one or more of these bases may a court set aside an order of the Adjustment Board." *Sheehan*, 439 U.S. at 93; *see also Seaboard*, 783 F.2d at 642  n.2 (implying same holding).

NetJets asserts none of the three grounds, and argues instead that public policy favoring safety in air travel and in the workplace necessitate an order from this Court vacating the Award. (Doc. # 22, 27). However, as *Sheehan* and *Jones* impart and ABX holds directly, "public policy arguments do not comport with the narrow grounds justifying judicial review" of Board awards. *ABX*, 2005 U.S. Dist. LEXIS 25345, at *17. NetJets' motion for summary judgment is therefore **DENIED**. (Doc. # 22).

## IV.    THE UNION'S MOTION FOR SUMMARY JUDGMENT

The Union moves for summary judgment on its counterclaim seeking enforcement of the Award. (Doc. # 23). NetJets reiterates its public policy argument in opposing the Union's motion. (Doc. # 26). After thoroughly reviewing the matter, the Court concludes that judgment is warranted in the Union's favor.

The Court's disposition of NetJets' motion for summary judgment greatly facilitates its ruling on the Union's motion. By simply restating its public policy argument, NetJets fails to

argue that the Board did not comport with the RLA when it issued the Award and also fails to assert that fraud and/or corruption was present.  (Doc. # 22, Doc. # 26).  In addition, it appears that the Board did not diverge from its jurisdiction.  Specifically, the Agreement gave the Board "jurisdiction over all disputes between any employee covered by this Agreement and [NetJets], growing out of grievances or out of interpretation or application of any of the terms of the agreement."  *Id.*  at § 22.3(a).  Piper was an employee covered by the Agreement who, through the Union, had grieved NetJets' decision to terminate him.  (Doc. # 1 at ¶ 27).  The Award focused on whether NetJets had just cause to terminate Piper's employment.  (Doc. # 1 Ex.  A at 8).  Thus, the Agreement's plain language gave the Board jurisdiction to address the dispute between NetJets and Piper, and the Award stayed within that jurisdiction. (Doc. # 1 Ex.  A at 8).

Having found no basis to vacate the Award, the Court must grant the Union's motion for summary judgment.  (Doc. # 23).

## CONCLUSION

NetJets' motion for summary judgment is **DENIED**.  (Doc. # 22).

The Union's motion for summary judgment is **GRANTED**.  (Doc. # 23).

The Clerk shall enter judgment accordingly and shall terminate this case on the Court's docket records.

**IT IS SO ORDERED.**

   /s/   Gregory L. Frost
**GREGORY L.  FROST**
**UNITED STATES DISTRICT COURT**

12